UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH, PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA <br> _ex rel._ <br> JASON SOBEK <br><br>     Plaintiffs, <br><br><br> v. <br><br> EDUCATION MANAGEMENT <br> CORPORATION; <br> EDUCATION MANAGEMENT, LLC; <br> SOUTH UNIVERSITY, LLC d/b/a <br> SOUTH UNIVERSITY ONLINE; ARGOSY <br> EDUCATION GROUP, INC. d/b/a <br> ARGOSY UNIVERSITY ONLINE; and <br> THE ART INSTITUTES INTERNATIONAL, <br> LLC d/b/a THE ART INSTITUTES ONLINE <br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CASE NO.: 10-0131 <br><br><br><br> FILED IN CAMERA AND <br> UNDER SEAL PURSUANT TO <br> 31 U.S.C. § 3730(b)(2) |

## AMENDED _QUI TAM_ COMPLAINT

1.      This is a _qui tam_ action brought by Relator, Jason Sobek, on behalf of the United

States of America, pursuant to the False Claims Act, 31 U.S.C. § 3729 _et seq_ (the "FCA"). The

false claims at issue were caused to be made by Education Management, LLC ("EDMC"),

specifically South University, LLC d/b/a South University Online, Argosy Education Group, Inc.

d/b/a Argosy University Online, and The Art Institutes International, LLC d/b/a The Art Institutes

Online (collectively "EDMC OHE"), in order to participate in the student financial assistance

programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20

U.S.C. § 1070 *et seq* ("Title IV, HEA programs"). These Title IV, HEA programs provide students with financial aid in the form of, among other things, Pell Grants and loans guaranteed by the federal government. Defendants engaged in this fraudulent action in order to obtain eligibility to participate in these financial assistance programs and receive federal funds.

2.     The FCA provides that any person who submits a false claim to the government is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Act permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. Pursuant to 31 U.S.C. § 3730(b)(2), this complaint must be filed *in camera* and under seal, without service on the defendant. The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

3.     Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' knowingly false and/or fraudulent certifications of eligibility to the Department of Education ("DOED") for its Title IV, HEA program. From 2004 through the present, Defendants knowingly submitted, caused to be submitted, and continues to submit and cause to be submitted, claims for payment to the DOED based upon these false certifications.

## JURISDICTION AND VENUE

4.     This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C.  1331, 31 U.S.C. § 3730, and 28 U.S.C. § 1345.

5.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a), which authorizes nationwide service of process. Defendants can be found in, reside in, or have transacted business in the Western District of Pennsylvania.

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or have transacted business in the Western District of Pennsylvania, and many of the alleged acts occurred in this District.

7.      Relator is an "original source" as defined by the False Claims Act, and no allegation set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing audit, or investigation, or from the news media.

## PARTIES

8.      Relator, Jason Sobek, is a resident of Pittsburgh, Pennsylvania, and is currently employed as a Project Associate Director of Admissions ("PADoA") for Defendant EDMC OHE's South University brand in Pittsburgh. In this role, Relator is required to recruit students for South University Online ("SUO"), and is also responsible for ensuring his admissions team enrolls, confirms, and secures financial aid funds for a predetermined required number of students, as mandated by EDMC corporate start plans. In the PADoA role, Relator must also meet or exceed his own predetermined weekly application averages, start plans, and start rates, which refer to the percentage of students who confirm in class and secure federal funds. Relator is responsible for ensuring that federal financial aid is complete for each enrolled student. Relator serves as an assistant to the admissions team leader, also known as a Second Assistant Director of Admissions ("DOA II"), and he frequently attends management, strategy, planning, and training meetings on behalf of his direct supervisor, Angela Shelton, a DOA II. Relator's role allows him wide access to enrollment data, reports, training materials, and memoranda detailing

the policies related to EDMC OHE. Relator was promoted to his current position in July 2009.

9.      Defendant Education Management Corporation is a publically-traded corporation headquartered in Pittsburgh, Pennsylvania. Each of the following Defendants is a wholly owned subsidiary of Education Management Corporation.

10.     Defendant Education Management, LLC ("EDMC") is among the largest providers of post-secondary education in North America based on student enrollment and revenue, with 94 locations in 28 U.S. states and Canada. Defendant is headquartered in Pittsburgh, Pennsylvania. Over 136,000 students were enrolled at Defendant's institutions as of October 2009. EDMC offers a broad range of academic programs concentrated in the creative and applied arts, behavioral sciences, education, health sciences, and business fields. Defendant awards associate, master, and doctoral degrees, and also has non-degree programs. Defendant is second only to The University of Phoenix in amount of federal financial aid collected each year.

11.     Defendant South University, LLC d/b/a South University Online is headquartered in Savannah, Georgia, and operates under the school code 013039.

12.     Defendant Argosy Education Group Inc. d/b/a Argosy University Online is headquartered in Phoenix Arizona, and operates under the school code 021799.

13.     Defendant The Art Institutes International, LLC d/b/a The Art Institutes Online is headquartered in Pittsburgh, Pennsylvania, and operates under the school code 007470.

## FACTUAL ALLEGATIONS

### Defendants' Certifications to the Government

14.     The Department of Education regulates educational institutions that participate in any student financial assistance programs authorized by Title IV of the Higher Education Act. Title IV includes several federally-funded programs, including the federal Pell Grant Program,

which provides need-based grants to low-income undergraduate and certain post-baccalaureate students to promote access to postsecondary education. In order for a student to receive a federal Pell Grant, the student must attend a school that is eligible to participate in the Title IV, HEA programs.

15.     Defendants sought and obtained eligibility to participate in Title IV, HEA programs as proprietary institutions of higher education. Defendants were therefore required to comply with a number of federal and state regulations.

16.     In order for a school to obtain eligibility to participate in Title IV, HEA programs, the school must first enter into a Program Participation Agreement ("PPA") with the Secretary of Education. This is a contract in which the school agrees that its participation "is subject to the terms and conditions set forth in [the] Agreement." Additionally, the participating school agrees to "comply with the programs' statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. Part 600 and for each Title IV, HEA program in which it participates, as well as... the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668." Defendants signed numerous PPAs with the DOE from 2004 to the present, and promised in each PPA to comply with all program statutes and regulations.

17.     By signing the PPAs, Defendants agreed to comply with a regulation that requires a school to be licensed to operate in each state in which it is doing business. Specifically, the institutions must be "legally authorized to provide an educational program beyond secondary education in the State in which the institution is physically located." 34 C.F.R. 600.5(a)(4). Therefore, if the school is not licensed by the state in which it is doing business, it is not eligible to participate in the Title IV, HEA funding programs.

## Defendants give incentive compensation to their recruiters

18.     The Higher Education Act prohibits colleges and universities from providing "any

commission, bonus, or other incentive payment..." to recruiters based on recruiting activities.

HEA § 487(a), (a)(20). The statutory ban was enacted in 1992 amid reports of numerous

institutions enrolling unqualified students for the sole reason of receiving federal student aid

funds from the United States Government. The statutory incentive compensation ban is a core

prerequisite to an educational institution's eligibility to request and receive federal Title IV

funds.

19.     The United States Government awards billions of dollars per year to help students

obtain their educations at colleges and vocational schools. In many instances, however, these

federal funds do not go directly to the students. Instead, the educational institutions request the

funds from the Department of Education or a third party lender, and the funds are wired directly

into the institutions' accounts. The institutions then credit their students for tuition.

20.     Students are responsible for repaying the United States Government once they

graduate or cease attending a university. Students who are disqualified from attending a college

or university must still repay federal loans. These students, who are often unable to complete

their educations and obtain jobs, are forced into dire financial situations. Those students who are

not dropped from schools, such as those run by EDMC, are required to take additional courses in

order to stay enrolled. The institutions, meanwhile, retain the fraudulently obtained funds.

21.     In flagrant  violation of the incentive compensation ban, Defendants

have engaged, and continue to engage, in behavior that involves paying bonuses and other

incentive payment to its recruiters based solely on their success in ensuring enrollments.

22.     For example, Relator received 20 quality points ("Highly Effective") on the

admissions performance review/compensation matrix for all three of his bi-annual reviews, yet his pay fluctuated within a range of $30,000 per year ($15.38-$29.56 per hour) based solely on the number of students he recruited.

23.     Demotions, terminations, promotions, raises, preferential work schedules and the quality of "leads" are all based directly on a recruiter's success in enrolling and starting students at Defendant schools. The 2008-2009 EDMC Admission Compensation Plan provides examples of the numbers of new students needed to "meet expectations," as well as the associated salary levels. The Compensation Plan (at page 11) uses this example:

Hire date: August 1, 2008; Review date: February 1, 2009 (1ˢᵗ Review)

18 new students, 8/1/2008-1/30/2009 (3 points each) --------- 54

Quality Points (Meets Expectations) ------------------------- 14

Annualized baseline salary ------------------------------- $39,000

Hire date: August 1, 2008; Review date: August 1, 2009 (2ⁿᵈ Review)

30 new students 2/1/2009-7/30/2009 (3 points each) --------- 90

Quality Points (Meets Expectations) ------------------------- 15

Annualized baseline salary ------------------------------- $44,000

24.     Defendant EDMC emphasizes the connection between salary and recruiting in an interactive chart titled, "What is Your Income Going to be Next Year?" This interactive "Matrix Calculator" calculates the number of new students that must be enrolled in order for a recruiter to earn a specific salary. After a recruiter chooses an income between $33,000 and $103,000, the calculator determines the number of new students needed to obtain that salary by year, admissions cycle, and week.

25.     Recruiting quotas are tracked in hourly, daily, weekly, monthly, and quarterly

reports, as well as in performance reviews and emails setting out "expectations." Admissions supervisors are reminded by email about their teams' performances. In a November 2009 email to the Directors of Admissions II team, Senior Director of Admissions Sam Yaghoubi explained:

> "Fridays are big days for us and we have some serious making up to do for the production from earlier this week. Get your teams focused and dialing... We should not have anyone with less than 150 calls and 3 hours of talk time. Don't forget about the goal to be on the board by noon... PGH [Pittsburgh], you have 30 minutes to get there."

26.     A main goal for admissions representatives is to ensure that enrolled students become "confirmed" in their classes. Confirmation occurs once a student logs into an online class, posts a short autobiography, and responds to posts by at least two other students in the course. This process can take as little as ten minutes. Unbeknownst to the student, once the confirmation process is complete, he or she loses the ability to withdraw from the course, and the school can then begin processing the student's loan application and collecting federal funds on his or her behalf.

27.     In a December 13, 2009 email to admissions supervisors, Director of Admissions Traci L. Roble instructed the admissions teams to call 124 students who had not yet confirmed and welcome them to class. In a detailed statement, she wrote:

> "We must attach a minimum of 60 more students to class today, MOVE basis, MOVE students in to 4/5 [financial aid packaging]."

28.     A recruiter who does not keep pace with expectations receives a written discussion memo outlining his or her "deficient performance." These memos note, among other things,  prior 4-week application (enrollment) averages, start rates (number of applicants who

have confirmed in class), and tenure of the recruiter (upon which start plans are based). Recruiters who receive these discussion memos are told, in writing, that they are expected to meet the minimum expectations of their roles. Additionally, they are assigned to training tasks, such as listening in on recruiting calls made by a representative who is exceeding his or her numbers (also called "Y-Connecting") and attending EDMC training sessions.

29.     Recruiters who do not increase sales after receiving a Discussion Memo are then issued a Performance Management Plan ("PMP"), which states that "if noticeable improvement is not met, accelerated disciplinary action up to or including termination may occur." These reports describe in detail the "unacceptable performance or conduct" as failing to meet "minimum expectations," and what must be done to improve. The deficiencies are reduced to a chart that compares the number of students who enroll, and subsequently start school, to the predetermined "plan."

30.     Sales and trends for each admissions representative and each admissions team are tracked in weekly reports. These reports measure "production" by week, past month, and past three months. The weekly reports also break down performance by individual admissions representative, the hire date of the admissions representative, and the admissions teams. The weekly admissions reports supplement daily "flash" reports which track and compare actual inquiries, applicants, and applications by tenure to the EDMC plan. These reports are generated for admissions teams in each Defendant school.

31.     The admissions team supervisors, or the DOA IIs, are evaluated on expectations of enrollment quotas that are detailed in plans. These plans list the expected number of gross applications, student starts, reinstated students, rollovers and pullbacks. Supervisors of teams that do not meet these criteria are demoted or terminated.

32.     As an academic session nears, recruiters who are in danger of missing their own quotas, or who are working on teams that are in danger of missing quotas, are required to work overtime and weekends in an effort to recruit enough students to meet Defendant EDMC's plan. Recruiters and teams in danger of missing their goals routinely enroll students who apply after the start dates for academic terms, called "pullback students." Many pullback students are enrolled in classes as late as ten days after the start of the term. These students frequently begin class without books and before their federal financial aid paperwork has been completed. Although pullback students are forced to start the term late, they are marked as having attended the first days of class. Defendant calculates pullback students' federal financial aid based on the start date for classes, not when the students actually began attending school. Pullback students routinely miss the add/drop period for classes at the beginning of a term, which only runs for a few days. Therefore, many pullback students are not afforded the opportunity to withdraw from classes once they have been enrolled.

33.     These pullback students allow recruiters to meet their quotas, but they are between 29 and 46 percent more likely to fail their classes, and one-third more likely to drop out altogether, than students who start their terms on time. Enrollment data from South University Online shows that 6.6 percent of all enrolled students from April 2004 through November 2009 were scheduled post-start. Because terms at some of the Defendant schools total less than 6 weeks, pullback students frequently miss up to one-fourth of their class time. The pullback students continue to be pushed into enrolling by admissions representatives even though Defendants' Instructional Specialists noted students would benefit more if the pullbacks were no longer allowed to occur.

34.     A December 2009 evaluation conducted by Defendant EDMC catalogued the

effect of "post starts" on courses that began in the summer of 2009 at the Art Institutes, South University, and Argosy University. The December 2009 EDMC Persistence Summary Review found that of the newly enrolled students, 25 percent of the Art Institutes' students, 36 percent of South University's students, and 26 percent of Argosy University's students had begun classes "post start." However, Defendant EDMC continues to receive federal financial aid for these pullback students in violation of its agreements with the U.S. Department of Education.

35.     Admissions representatives at Defendant schools routinely enroll mentally ill students without discretion. In an effort to meet start plans, representatives routinely sell financial aid stipends to prospective students, along with promises of excess funds for vacations, bills, or other "needs" the prospective student disclosed during the interview process. Mentally ill students are frequently required to retake classes, and are likely to default on their student loans.

36.     Defendant Art Institutes Online pays its career service counselors bonuses based on (1) the percentage of graduates successfully employed three months and six months after graduation, (2) whether the graduates' average starting salary exceeded $29,545, (3) whether the counselors completed exit interviews with 50 percent of the previous class, and (4) whether the counselors submitted two student success stories to the marketing department. The bonuses range from $700 to $3000 per quarter.

## Defendants do not adequately track student progress

37.     In order to receive any federal grant or loan, a student must maintain satisfactory progress in his or her course of study according to the educational institution's published standards of satisfactory progress. 34 C.F.R. 668.32. A student is maintaining satisfactory progress if (1) the institution at which the student is in attendance reviews the progress of the

student at the end of each academic year, or its equivalent, as determined by the institution, and (2) the student has a cumulative "C" average or its equivalent, or academic standing consistent with the requirements for graduation, as determined by the institution, at the end of the student's second academic year. 20 U.S.C. 1091.

38.     Defendant South University's 2009-2010 course catalog lists (at page 72) its "Minimum Standards for Academic Progress" as maintaining a minimum acceptable cumulative grade point average, achieving the minimum incremental completion rate, and completing the program within a maximum allowable time frame. The catalog also states (at page 73) that students will be academically dismissed for any of the following conditions: having a cumulative grade point average ("CGPA") below 2.0 at the end of the seventh quarter of the program, having an incremental completion rate ("ICR") below 66.67% at the end of the ninth quarter, or failing to complete all program requirements within the maximum allowable time frame.

39.     Defendant EDMC instructs its staff as to specific times that students should be tested to ensure the Standards of Academic Progress ("SAP") are satisfied. Internal notes from Defendant's academic advising staff indicate that nursing and graduate students are to be tested at the end of the first quarter, while other undergraduate students should be tested after 270 days of schooling. However, a presentation prepared by an EDMC instructional designer said the schools tested every student at 90 days.

40.     Contrary to its public pronouncements and internal policies, South University Online routinely does not have any plan in place to calculate the Academic Progress for at least ten percent of its students after a year of classes had already passed.

41.     Based on South University Online's enrollment data from 2004 through the present, after 90 days of class time had already passed, the University still has no SAP test plan

in place for, on average, 55 percent of its undergraduate nursing students, 33 percent of its

graduate students, and 16 percent of its undergraduate students.

42.     Relator believes that the procedures regarding SAP calculation procedures at

Argosy University and the Art Institutes also violate internal school rules, publicly stated

policies, and federal law.

43.     Defendant South University does not have an attendance policy. Instead, it relies

on students to log into online classes, post comments, and complete the required course work.

South University's attendance records from October 2008 through November 2009 indicate that

two out of every five students enrolled in online courses spent a third or less of the required class

time online. Fifty percent of the students spent only 40 percent or less of the required class time

logged into their online classes.

44.     In order to justify the continued receipt of federal financial aid for students,

South University Online must verify that students are actually attending classes. To satisfy this

requirement, South University created the "Week 3 Grade F Policy." Instead of withdrawing

students who do not attend classes, the University's Week 3 Grade F Policy requires that

delinquent students receive a grade of "F," which illegally entitles South University to continue

to receive federal aid for those students. A portion of the Week 3 Grade F Policy reads:

> "South University does not have an attendance policy. However, in order
> to justify receiving and keeping financial aid for a student, we must verify
> that they are actually attending classes. So, the Week 3 process was
> created as a way to verify attendance to remain in compliance with
> Financial Aid. The process originally involved immediately withdrawing a
> student who was not participating. This was detrimental to students, so the

process was changed so that, instead of being withdrawn, students would receive final grades of 'F.'"

45.     An example of the Week 3 Grade F Policy at work is illustrated in the case of Anna Navarro. Ms. Navarro was enrolled by South University Online recruiters after she researched higher education at a college help center in February 2009. On February 18, 2009, the school waived her application fee. She was scheduled to start class in April 2009. However, shortly after enrolling, Ms. Navarro attempted to withdraw from South University Online by contacting her academic advisor, Christian Manring. Despite numerous phone calls over a period of months, counselors at South University failed to contact Ms. Navarro or drop her from classes. Though Ms. Navarro requested she be dropped and made it clear that she was not participating in her online classes, South University continued to certify Ms. Navarro's attendance and receive federal aid on her behalf. Although Ms. Navarro was not attending classes, South University gave her a failing grade instead of allowing her to withdraw, which was done in an effort to maximize the receipt of federal aid. Ms. Navarro first attempted to drop her classes in April 2009. Internal South University records, however, indicate that her last day of attendance was officially October 26, 2009. South University finally withdrew Ms. Navarro from classes only after Relator intervened on her behalf.

### Defendants' numerous recruiting violations

46.     Defendants' recruiters are trained to tout job placement rates and potential salaries, as well as the assistance Defendant schools will provide to graduates seeking employment, to students they are seeking to enroll. Recruiters rely on internal documents, and tell prospective students that, overall, 87 percent of Art Institute graduates and 92 percent of South University graduates are employed in a field related to their studies. In July 2009, graduate

statistics listed the average salary for South University graduates at $51,000, and the average

salary for Art Institute graduates at $31,455.

47.     The recruiters' sales pitches fail to inform prospective students that EDMC keeps

two separate sets of job placement statistics. One set is kept for accrediting agencies. The second

set is kept for prospective students, employers, and the "investment community." The differences

between these two reports hinge on which graduates are and are not counted in the statistics.

Placement rates quotes to prospective students eliminate graduates who are single, stay-at-home

parents, as well as graduates with jobs outside of their fields. These reductions artificially inflate

the job placement rates. On the other hand, reports provided to state regulators and the

accrediting agencies responsible for evaluating EDMC schools include the single, stay-at-home

parents and the graduates with jobs outside of their fields. The Career Services Statistical

Reporting Procedures explain:

> "This category does not meet the waiver guidelines of most accreditation and state
> agency governing bodies and these employments are counted differently on those
> reports. The waiver does, however, determine the numbers EDMC reports
> internally and externally, including to prospective students, employers and the
> investment community."

48.     The recruiting sales pitches do not tell prospective students that EDMC considers

graduates who only work for a single day to be "employed," which was a policy put in place

after too many graduates failed to show up for their second days of work. The internal reporting

procedures explain that in order to be counted:

> "The graduate must work at least one day. No additional days on the job are
> required as long as the grad went to a job that fit their skill level."

49.     Recruiters also fail to point out that EDMC's rules allow for counting a graduate as working in his or her field when as little as 25 percent of the job relates to the graduate's education. The Art Institutes count a graduate as being employed in his or her field if 25 percent of the job relates to the graduate's educational program's "core competencies." South University and Argosy University consider a graduate to be employed in his or her field if 50 percent of the job relates to the core competencies of that graduate's educational program.

50.     Defendant EDMC routinely tracks students who withdraw, drop out, or fail. Students from South University, Argosy University, and the Art Institutes are surveyed to find out why they left the schools. Responses from those students include complaints about costs, as well as complaints that they were misled about educational programs.

51.     Defendant EDMC trains its recruiters to avoid speaking about the costs of schooling and specifics of the educational programs. Costs are discussed only if the prospective student repeatedly asks, and even then only as to the cost per credit hour of the classes. While recruiters will disclose the price per credit hour, they are trained not to discuss the number of credit hours required.

52.     In a December 9, 2009 management training session attended by Relator, the supervisor of one of the top-selling admissions teams, Glen Washington, told his colleagues to bully prospective students until they enrolled. Mr. Washington said recruiters should take risks and not worry about compliance issues because they have three "Get Out of Jail Free Cards." Mr. Washington told other admission team supervisors that if recruiters were caught breaking the rules, they should simply say: "I didn't know," "I forgot," or "Nobody told me."

53.     Compliance at EDMC monitors a small percentage of telephone calls between recruiters and prospective students. Compliance, however, does not review calls between

recruiters and prospective students that take place on private or company cell phones. In the event compliance notes a violation, a written report is forwarded to the admissions team supervisor, who tells the recruiter in violation to sign the form acknowledging receipt. The recruiter is then sent back to work. There are no counseling programs, and recruiters consider those notices to be a joke.

54.     Glen Washington also told his colleagues that recruiters should spend no more than fifteen minutes explaining the program and its costs before walking prospects through the online application and financial paperwork necessary for enrollment. His admissions team follows the three-step selling technique from Dr. Seuss. Mr. Washington told his team to hang up a copy of this technique in their cubicles. The Dr. Seuss technique, in part, says:

> "1. Sam is selling a product and although his prospect is not initially interested, Sam doesn't let that deter him from asking... 3. He refuses to give up. No matter how many times his prospect says 'no,' Sam keeps offering alternatives. He offers fourteen options before finally closing the sale."

55.     The sales technique used by Washington's team also adds: "I am not suggesting that you pester your customers, but most people give up too early in the sales process."

56.     EDMC's selling techniques rely on aggressiveness, persistence, and pushing propects' "hot buttons," which are uncovered through in-depth interviews with recruiters. The schools' trainers call this technique "digging deep." EDMC trains recruiters to uncover a prospect's motivation, so that this motivation can later be used to overcome that prospect's objections. Recruiters are trained to fill out a "Student Success Profile" for each interview in order to "insure the success of the student and uncover the student's needs." In fact, this Student Success Profile is merely a way to discover a student's "hot buttons" and provide a quick way for

representatives to find ways to talk the student out of withdrawing.

57.     This so-called Student Success Profile provides a chart highlighting the essential elements of the sales technique used at EDMC. The form provides space for recruiters to note the prospect's "confirmed need" for attending college and the "hot buttons" that can be used to overcome that prospect's potential objections. These hot buttons are described as "pleasure" and "pain."

58.     A training document used in role-playing exercises with EDMC recruiters elaborates on those pleasure and pain principles. During training, recruiters are asked, "what motivates people to do things?" The answer at EDMC is: "pleasure and pain."

59.     Recruiters are taught to dig deep in order to find their prospects' "confirmed needs." Trainers describe a "potential need" as the reason given by a prospective student as to why he or she wants to attend college to earn a degree. They illustrate a "confirmed need" as a potential student explaining that he needs "a bigger house to have more kids in a better neighborhood so that they can live a better life." Once a recruiter receives a "large commitment," he is to push the student to apply. According to the training, recruiters are to probe until the potential student provides a confirmed need.

60.     Additionally, recruiters are taught to talk "easily" with the prospects, to build rapport and friendships with them, and to ask open-ended questions in an effort to uncover potential and confirmed needs. These open-ended questions enable recruiters to gather "golden nuggets" of information and the "hot buttons" needed to overcome prospects' objections. A training document adds:

            "When are you allowed to call a student a LOSER? When they give us permission
            by telling us why they think they are a loser. You can repeat it back to them."

61.     Recruiters are instructed to paint a picture of the past, the present, and the future. Recruiters are taught to describe the future both with and without a degree from EDMC while using the "golden nuggets" and "hot buttons" uncovered during the "uncovering needs" process. EDMC teaches recruiters to close their sales by restating what they have been told by the prospects, using the hot buttons to complete the transactions.

62.     EDMC heavily markets its school brands through direct mail and email campaigns, internet advertisements, television, radio, print publications, and outdoor billboards. These marketing campaigns, internally called "lead sources," are bolstered through field recruiters who canvass high schools to recruit recent graduates, contracted telemarketers, and partner web sites that entice would-be students seeking information on higher education to provide contact information so that the web sites can "match" the prospective student to a partner school. Prospect information gathered from the internet is funneled electronically to in-house recruiters for immediate contact through an automatic dialing system, internally referred to as "PACE." Supervisors then push recruiters to contact everyone within fifteen minutes in an effort to keep competitors from snatching detailed trend analyses of leads produced by the lead sources. This enables EDMC and its supervisors to identify the prospects that are most likely to enroll at an EDMC school before the prospects are ever contacted by recruiters. In order to maximize enrollment, these top leads are directed to EDMC's top in-house recruiters, as measured by performance evaluations and trend reports. The recruiters with the highest start rates handle telephone calls that are "warm transferred" from internet sites and contracted third-party telemarketing and recruiting centers. In these cases, prospective students who telephone a third-party vendor that contracts with EDMC, such as Education Connection and Double Positive, are transferred directly to EDMC's in-house recruiters. In many instances, "warm

transfers" are contacted after they fill out job applications, and are not even seeking information about education when they are transferred to EDMC recruiters. EDMC recruiters then attempt to convince the warm transfer that it would be much easier to get the advertised job with an education from an EDMC-brand school.

63.     After exceeding his quota by 500 percent in the summer of 2008, Relator received many warm transfers from partner and job hunter web sites. While these transfers come from many sources, three of the most prominent are Education Connection, ESM and Career Builder.com Through detailed conversations with these would-be students, Relator learned that many had been warm transferred to his workstation after completing an online application for a job or contacting an online job site. While the lead sources varied, the student prospects told remarkably similar stories: Job hunters were told that they did not have the credentials to get the advertised job, and were then convinced that a college degree would change their futures. A job hunter turns into a prospective college student, and is then warm transferred to recruiters at EDMC. Many of these prospects had applied for positions on Careerbuilder.com and Warehouse.com Data maintained by EDMC records and describes the lead sources for students and whether they were warm transferred to school recruiters. Together, leads provided by EducationConnection.com, Careerbuilder.com and ESM represent 6 percent of the total students enrolled at South University.

64.     Defendant South University asserts on its Campus Tours that its MSN Nurse Practitioner and Accelerated RN to MSN nursing programs are CCNE accredited, but they are not. Students who rely on these false statements and attend Defendant's nursing programs often find themselves unable to practice in the nursing field after graduation, as CCNE accreditation is required in several states. When asked specifically whether recruiters should tell prospective

nursing students that portions of the program are not accredited, the Associate Director of

Nursing and Health Professions said:

> "No, you don't have to say that we are not accredited yet, but if they do ask, you
>
> have to tell them that we are in the process."

65.    Anita Shaughnessy, South University's Director of New Programs, was quick to

instruct recruiters specializing in health care. In a January 8, 2010 email, Shaughnessy explained

that it had come to her attention that many students are not fully aware that some of the school's

nursing programs are not accredited. She told recruiters the school does not know when the

program will be accredited, and added:

> "It is vitally important that we **do not** in any way indicate that our program will
>
> allow them to take advance practice nursing exams. The student must be a well
>
> educated consumer. They need to check with their state nursing board. We have
>
> come across a couple of states so far, Maryland and Tennessee, that require the
>
> MSN program to be accredited. We are going to compile a list of states that
>
> require CCNE accreditation and determine any additional approval process we
>
> may need to meet. This will take some time."

### Defendants falsely certified student loans

66.    A student qualifies for a False Certification discharge of a Direct Loan if he or she

received a loan that was falsely certified by a school. A loan is considered falsely certified if the

school knowingly admitted the student, even though he or she had a "physical, mental, or legal

status or condition that would legally bar employment in [the student's] field of study."

67.    Defendants' admissions representatives intentionally and routinely misrepresented

program requirements and enrolled students into program areas in which the representatives

knew the students would not be able to secure employment. For example, admissions representatives at Defendants' schools have enrolled students with felony arrests on their records into Criminal Justice programs, even though the representatives were aware that those students could not get jobs in the Criminal Justice field with felony arrest records. If a prospective student expressed concern about his or her criminal record, the admissions representative would tell the prospect that it was not a problem, and he or she would be directly enrolled into the Criminal Justice program.

### Defendants are not licensed to operate online schools in Texas, and are not exempt from licensing

68.     In Texas, a career school or college may not maintain or conduct any program of instruction until it receives a Certificate of Approval from the Texas Workforce Commission. Tex. Educ. Code § 132.051. Each school must obtain a Certificate of Approval for each location where the courses of instruction will be offered. Tex. Admin. Code § 807.14(a).

69.     From April 2004 through the present, Defendant operated South University Online ("SUO"), an internet-based, distance education program offering seven master degree-granting programs, seven bachelor degree-granting programs, and five associate degree-granting programs. SUO has not received a Certificate of Approval from the Texas Workforce Commission for the operation of a distance education program in Texas. SUO does not appear on the complete list of schools that had received Certificates of Approval for distance education programs in Texas as of December 16, 2009.

70.     As a result, thousands of students have been enrolled in distance education programs operated by Defendant South University in Texas that are not approved by the Texas Workforce Commission. Electronic data maintained by South University lists 2,223 students with

Texas addresses as having enrolled in its online program from April 2004 through December 2009. This listing excludes students who cancelled enrollment or who were ineligible for federal financial aid.

71.     Defendant South University regularly generates reports breaking down the demographic makeup of students attending its schools. A report from the second quarter of winter 2009 lists 569 students from Texas, which is approximately six percent of the 8,785 student body.

72.     From 2004 through the present, Defendant Argosy University operated Argosy University Online ("AUO"), an internet-based distance education program offering seven master degree-granting programs, nine bachelor degree-granting programs, and eight associate degree-granting programs. AUO does not appear on the complete list of schools that received a Certificate of Approval for distance education programs in Texas as of December 16, 2009.

73.     As a result, hundreds of students have been enrolled in distance education programs operated by Defendant Argosy University that are not approved by the Texas Workforce Commission. A partial listing of students who are enrolled at AUO shows 243 students with Texas addresses, which is approximately 4 percent of the sample of 4,962 students enrolled in online classes at Argosy University between September 2006 and April 2009.

**Defendants Received Federal Financial Aid as a Result of their False Claims**

74.     Through their numerous false certifications to the government, including the DOED and the TWC, Defendants intentionally misled the United States to believe they were eligible to participate in Title IV, HEA programs when, in fact, they were not. The United States relied on Defendants' state licenses and program approvals, all of which were secured through false certifications.

75.     Defendants receive federal funds from several different Title IV, HEA programs. One of these programs is te Pell Grant Program, which pays grants directly to a school for the benefit of its students. These grants do not have to be repaid.

76.     In addition to Pell Grants, Defendants receive the proceeds of federally guaranteed student loans. Through student loans, a qualifying student borrows money from a financial institution, and the amount of money borrowed is guaranteed by a guaranty agency; the guaranty agency guarantees the lender from loss due to a borrower's default. The federal government then reimburses the guaranty agency for all or part of the amount of the default claims the guaranty agency must pay to a lender on the defaulted student loan.

77.     Due to Defendants' false certifications as to eligibility to participate in Title IV, HEA programs, Defendants were able to receive federal funds in the form of Pell grants and federally guaranteed student loans that the United States, in many instances, ultimately will be forced to repay because of student defaults. Each of Defendants' requests for federal grants or guaranteed student loan money to which they were not entitled constituted a false claim to the United States.

78.     Relator estimates that financial losses to the government due to Defendants' fraudulent conduct are approximately $202,000,000.

## COUNT I

### Violation of the False Claims Act, 31 U.S.C. § 3729(a) prior to and after the amendments enacted on May 20, 2009

79.     Relator realleges and incorporates by reference the allegations of paragraphs 1-78 of this complaint.

80.     This count sets forth claims for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. § 3729-3732.

81.     Through the acts described above, Defendants and their agents and employees knowingly caused to be presented false and/or fraudulent claims, records, and statements in order to obtain federal student loan funding for students enrolled at its campuses.

82.     Under the False Claims Act, 31 U.S.C. § 3729(a), in effect prior to May 20, 2009, Defendants have violated:

(a)     31 U.S.C. § 3729(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(b)     31 U.S.C. § 3729(a)(2) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government; and/or

(c)     31 U.S.C. § 3729(a)(3) by conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid.

83.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1) as amended on May 20, 2009, Defendants have violated:

(a)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

(b)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim; and/or

(c)     31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subparagraph (A) or (B).

84.     The United States, unaware of the falsity of the claims, approved, paid, and participated in payments made by the United States for claims that otherwise would not have been allowed.

85.     By reason of Defendants' false claims, the United States has been damaged, and possibly continues to be damaged.

## COUNT II

### Violation of the Reverse False Claims Act, 31 U.S.C. § 3729(a) prior to and after the amendments enacted on May 20, 2009

86.     Relator realleges and incorporates by reference the allegations of paragraphs 1-78 of this complaint.

87.     Through the acts described above, Defendants and their agents and employees intentionally and knowingly failed to report students who should have been dropped from Defendants' schools due to attendance violations and/or enrollment into programs falsely certified by Defendants in order to "conceal, avoid, or decrease" an obligation by Defendants to return federal funding in the form of Pell grants and federally guaranteed loans to the government.

88.     Under the False Claims Act, 31 U.S.C. § 3729(a) in effect prior to May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government.

89.     Under the False Claims Act, 31 U.S.C. § 3729(a)(1) as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

90.     Defendants' fraudulent concealment and intentional failure to report improperly enrolled students and students enrolled into programs falsely certified by Defendant schools in order to avoid refunding federal money in the form of Pell grants and federally guaranteed loans constitutes an unlawful avoidance of an obligation to pay money owed to the United States.

91.     Defendants' unlawful conduct is continuing in nature and has caused the United States to suffer damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff/Relator requests that judgment be entered against Defendants, ordering that:

a.     Defendants cease and desist from violating the Federal False Claims Act;

b.     Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

c.     Defendants pay maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

d.     Plaintiff/Relator be awarded the maximum amount allowable pursuant to the Federal False Claims Act;

e.     Plaintiff/Relator be awarded all costs of this action, including attorneys' fees , expenses, and costs; and

f.     United States and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, hereby demands a trial by jury.

Dated this ___8th___ day of ___June, 2010___

ANDREW M. STONE, ESQ.
Attorney No.: 35176
astone@stone-law-firm.com
**STONE LAW FIRM, LLC**
1806 Frick Building
437 Grant Street
Pittsburgh, PA 15219
Telephone: (412) 391-2005
Fax: (412) 391-0853
**Local Counsel for Relator**

ELAINE STROMGREN
Florida Bar No.: 0417610
estromgren@jameshoyer.com
JOHN R. NEWCOMER, JR.
Florida Bar No.: 143380
jnewcomer@jameshoyer.com
**JAMES, HOYER, NEWCOMER,
SMILJANICH & YANCHUNIS, P.A.**
One Urban Centre, Suite 550
4830 West Kennedy Boulevard
Tampa, Florida 33609
Telephone: (813) 286-4100
Fax: (813) 286-4174
**Lead Counsel for Relator**