IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.,* JASON SOBEK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-131 |
| | ) | District Judge Terrance F. McVerry |
| EDUCATION MANAGEMENT, LLC, | ) | Magistrate Judge Cynthia Reed Eddy |
| SOUTH UNIVERSITY, LLC, | ) | |
| *doing business as* | ) | |
| SOUTH UNIVERSITY ONLINE, | ) | |
| ARGOSY EDUCATION GROUP, INC., | ) | |
| *doing business as* | ) | |
| ARGOSY UNIVERSITY ONLINE, | ) | |
| THE ART INSTITUTES | ) | |
| INTERNATIONAL, LLC, | ) | |
| *doing business as* | ) | |
| THE ART INSTITUTES ONLINE, and | ) | |
| EDUCATION MANAGEMENT | ) | |
| CORPORATION, | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

In this *qui tam* action filed pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-

3733, Relator Jason Sobek alleges that Education Management Corporation and its affiliates, in

order to immerse themselves in various Higher Education Act financial aid funding streams,

provided through Title IV of the Act, falsely and knowingly certified to the Department and

Secretary of Education that each defendant educational institution was in compliance and

intended to remain in compliance with conditions of eligibility, embodied in statute, regulation

and Program Participation Agreements ("PPAs"), which conditions are prerequisites to each

institution's participation in those financial aid programs.

Essentially, Relator alleges a multi-faceted, corporate-wide scheme to enroll as many

students as possible, and to keep them on the rolls for as long as possible, without regard to the students' qualifications or their likelihood of graduation or career placement, in order to maximize financial aid from the United States Department of Education ("DOE"), which assumes the risk of delinquent student loans. In so doing, Relator claims, Defendants knowingly, routinely and falsely certified to DOE, in violation of section 3729(a) of the FCA, 31 U.S.C. § 3729(a), that they were in compliance with all conditions of eligibility to participate in the federal loan/grant funding streams to which they had agreed to be bound when they executed the PPAs with the Secretary of Education. The prerequisite conditions of eligibility include that Defendants maintain an incentive compensation ban and fulfill their obligations to present honest, accurate information to prospective and enrolled students with regard to the cost of educational programs and degrees, job placement statistics and accreditation.

For the reasons set forth herein, it is respectfully recommended that Defendants' Motion to Dismiss Second Amended *Qui Tam* Complaint Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) (ECF No. 48) be GRANTED in part and DENIED in part. Specifically, it is recommended that the motion to dismiss be granted as to Counts III, V and VI, with prejudice, and denied with respect to Counts I, II and IV, as to which Relator has offered sufficient facts to meet his burden of pleading the elements of his section 3729(a) claims and sufficient facts to plausibly support said claims and provide adequate notice to Defendants of the claims made against them.

## II. REPORT

### A. Procedural History

On January 28, 2010, Jason Sobek filed his initial *qui tam* complaint against Defendants, Education Management Corporation, Education Management, LLC (collectively, "EDMC"), South University, LLC d/b/a South University Online, Argosy Education Group, Inc., d/b/a

Argosy University Online, and The Art Institutes International, LLC, d/b/a The Art Institutes Online (collectively, "Defendants"), as Relator on behalf of the United States of America, pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733. Complaint, (ECF No. 2). Pursuant to FCA procedures, the Complaint was filed under seal with notification only to the United States of America, which began its investigation of the matters alleged to determine whether it would exercise its right to intervene in the case. 31 U.S.C. § 3730. As further provided by the FCA, 31 U.S.C. § 3730(b)(3), the government filed eight motions to extend the seal period for good cause, all of which were granted. *See* (ECF Nos. 3-4, 5-6, 10-11, 12-13, 14-15, 16-17, 18-19, 20-21).

By Order dated October 13, 2011, the last of these extended the seal period until January 10, 2012. The case was reassigned to this Court on October 27, 2011.

On January 11, 2012, the government filed another motion to extend the seal period to allow additional time to complete its investigation, which this Court granted until February 9, 2012. *See* text order of January 12, 2012.[1] Thereafter, this Court granted Relator permission to file a Second Amended *Qui Tam* Complaint, which he did on February 10, 2012. Second Amended *Qui Tam* Complaint ("SAC"), (ECF No. 27). This amended complaint was not filed under seal as, by then, the government had decided not to intervene.

On May 29, 2012, Defendants filed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), (ECF No. 48), with brief in support. Relator's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended *Qui Tam* Complaint (ECF No. 61) set off an initial skirmish (i.e., motions to amend seal orders and responses thereto by the parties and the government) by references to the still-sealed Notice Of The United States That It Is Not Intervening At This Time (ECF No. 24), and argument against dismissal because the

---

[1] Although the motions to extend the time period and orders granting same remain under seal, Defendants now have received copies of the motions and orders.

United States and the DOE "have been actively investigating Relator's claims since January 2010," and "could have dismissed this case if it thought that [the case] was spurious or without merit." *Id.* at 3, 19.

On September 6, 2012, this Court ruled on the motion and amended motion to amend seal order, (ECF No. 86), and directed the United States to deliver to EDMC copies of all extension motions and related orders of court. *See* note 1. The motion to dismiss is now ripe for resolution.

On October 2, 2012, the Clerk of Court reassigned this action to the Honorable Terrence F. McVerry, who is presiding over a related pending case at Civil Action No. 07-0461, *United States ex rel. Washington v. Education Management Corporation, et al. See United States ex rel. Washington v. Education Management Corporation*, 2012 WL 1658482 (W.D.Pa., May 11, 2012).[2] (hereafter, "*Education Management Corp.*").

### B. Second Amended *Qui Tam* Complaint ("SAC")

In its introductory paragraphs, the SAC states that through "a carefully-crafted and wide-spread for-profit education scheme, Defendants . . . have defrauded the United States and its taxpayers out of millions of dollars in the form of federally-backed student loans and grants, and further:

> 2. Educational entities such as Defendants are motivated by profit rather than student success or rankings, and therefore have every incentive to maximize enrollment by recruiting unqualified students who will not be able to repay their loans. . . . [,], taking zero risk in signing up students for federally-guaranteed loans. . . . [A]lthough students at for-profits represent only 11 percent of all higher-education students, they represent 26 percent of loan borrowers and 43 percent of loan defaulters [and] . . . more than 25 percent of for-profits derive 80 percent of their revenues from taxpayer-funded federal financial aid.
>
> \*   \*   \*

---

[2] Former presiding District Judge Cercone found this case to be related to Civil Action No. 07-461, and directed the Clerk of Court to reassign it to District Judge McVerry. Order of October 1, 2012, (ECF No. 87).

4.    The FCA provides that any person who submits, or causes to be submitted, a false claim to the government is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Act permits persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. . . .

5.    Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' knowingly false and/or fraudulent certifications of eligibility to the Department of Education ("DOE") for its Title IV, HEA programs. From at least 2004 and, upon information and belief, continuing through the present, Defendants knowingly submitted and caused to be submitted false claims for payment to the DOE based upon their false certifications.

SAC (ECF No. 27), ¶¶ 2, 4-5.

More particularly, the SAC sets forth the following narrative. Relator Sobek was a Project Associate Director of Admissions for EDMC Online Higher Education's South University brand in Pittsburgh, Pennsylvania from June 2008 until November 2010. In that role, he recruited students for South University Online ("SUO"), and was "responsible for ensuring his admissions team enrolled, confirmed, and secured financial aid funds for predetermined numbers of students, as mandated" by EDMC's corporate start plans. Moreover, "Relator was also required to meet or exceed his own predetermined weekly applications averages, start plans, and start rates," was "responsible for ensuring that federal financial aid was completed" for each student, and "frequently attended management, strategy, planning and training meetings on behalf of his direct supervisor . . . . Relator's role allowed him wide access to enrollment data, reports, training materials, and memoranda detailing the policies related to EDMC . . . ." SAC (ECF No. 27), ¶ 9.

Defendant EMC is a publically-traded corporation headquartered in Pittsburgh, and Defendant Education Management, LLC is

5

among the largest providers of post-secondary education in North America based on student enrollment and revenue, with 106 locations in 32 U.S. states and Canada. Defendant EDMC is headquartered in Pittsburgh, Pennsylvania. Over 151,000 students were enrolled at EDMC's institutions as of October 2011. EMC offers a broad range of academic programs concentrated in the creative and applied arts, behavioral sciences, education, health sciences, and business fields. EDMC awards associate, bachelor, master and doctoral degrees, and also has non-degree programs. EDMC is second only to the University of Phoenix in amount of federal financial aid collected each year.

SAC (ECF No. 27), ¶¶ 10-11. Education Management, LLC, South University, LLC d/b/a South University Online, Argosy Education Group, Inc., d/b/a Argosy University Online, and The Art Institutes International, LLC, d/b/a The Art Institutes Online are wholly owned subsidiaries of EMC. SAC (ECF No. 27), ¶¶ 10, 12-15.

Relator states that the DOE regulates educational institutions that participate in "any student financial assistance programs authorized by Title IV of the Higher Education Act," which includes the Pell Grant program, Federal Stafford Loans, and Federal Perkins Loans, and that, in order for a student to receive federal grants or federally-backed loans, "the student must attend a school that is eligible to participate in the Title IV, HEA programs." SAC (ECF No. 27), ¶¶ 16-17.

In order for a school to be eligible to participate in Title IV, HEA financial aid programs, each school must enter into a Program Participation Agreement with the Secretary of Education. The PPA is a contract in which the school agrees that its participation "is subject to the terms and conditions set forth" therein. Additionally, each participating school agrees to "comply with the programs' statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. Part 600 and for each Title IV, HEA program in which it participates, as well as . . . the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668." SAC (ECF No. 27), ¶¶ 18-19. Defendants are alleged to have "signed numerous PPAs with the DOE from at

6

least 2004 through the present, and promised in each PPA to comply with all program statutes and regulations." SAC (ECF No. 27), ¶ 20.

Relator describes a scheme to defraud the DOE in the following general terms:

21.    All of Defendants' schools . . . abide by a simple formula: recruit as many students as possible with the greatest financial needs possible and enroll them in high-cost programs to maximize the amount of federal funding received. Defendants had a corps of recruiters, all well-trained in sales and closing techniques, who perfected the art of preying on the hopes and dreams of vulnerable students desperately seeking better lives. . . .

22.    Defendants have built their business on a predatory scheme that affects every aspect of a student's experience. From aggressive and misleading marketing practices designed to target vulnerable students, to their admissions representatives' compensation structure, which was based on per-head recruiting quotas, to their failure to adequately track students' progress and attendance, Defendants made it abundantly clear that they viewed students as dollar signs, and did not care about whether the students they enrolled were ready for college, much less whether they succeeded once they enrolled.

23.    From at least 2004, and upon information and belief, continuing through the present, Defendants refused to abide by federal regulations put in place to protect students, and instead focused on maximizing the "for-profit" title they richly deserved. Each time Defendants made certifications to the DOE, Defendants were aware they were not in compliance with mandatory regulations, and that they had no intention of complying if it meant sacrificing profit margins.

24.    Defendants' nationwide false claims and certifications have caused, and continue to cause, financial harm to the United States and its taxpayers.

SAC (ECF No. 27), ¶¶ 21-25.

Defendants aggressively solicited potential students, from a variety of lead sources, from 2004 through the present, using high pressure sales tactics and misrepresentations about the total price tag that comes along with courses of study and degrees, job placement statistics, and program accreditation, among other things. A "boiler-room atmosphere" existed for recruiters, whose "livelihoods were dependent on such [misleading] statements because bonuses and job retention were based on meeting and exceeding per-head recruiting quotas." Defendants targeted

"the poor, the undereducated, the homeless, those who were the first in their families to attempt higher education, those with criminal records, those who were mentally and emotionally challenged, single mothers on welfare, and those living in shelters and halfway houses." SAC (ECF No. 27), ¶¶ 25-26.

Relator further asserts that Defendants "encouraged their admissions representatives to mislead incoming students," resulting in "the United States . . . footing the bill for students who should not have enrolled in Defendants' schools, and who would not have enrolled but for Defendants' blatant misrepresentations [and] . . . marketing practices . . . designed to prey on individuals' weaknesses and vulnerabilities in order to get them to enroll in classes and sign up for federal loans and grants." SAC (ECF No. 27), ¶ 28. The SAC elaborates in some detail the allegedly misleading and aggressive EDMC designed sales techniques and "boiler-room" atmosphere of the telephone solicitation rooms. SAC (ECF No. 27), ¶¶ 29-38.

The SAC places the various alleged misrepresentations and false certifications of eligibility into the five categories set forth below.

**Misrepresentations as to Program Accreditation - SAC (ECF No. 27), ¶¶ 42-47**

Relator avers that Defendants consistently and routinely made false, erroneous or misleading statements concerning, *inter alia*, the particular types, specific sources, nature and extent of its "institutional, programmatic, or specialized accreditation"; whether a student "may transfer course credits earned at the institution to any other institution"; and whether successful completion of a course of instruction qualifies a student "to receive, to apply to take or to take the examination required to receive, a local, State, or Federal license, or a nongovernmental certification required as a precondition for employment," or to "meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a

recognized occupation for which the program is represented to prepare students," in violation of 34 C.F.R. § 668.72. SAC (ECF No. 27), ¶ 42. As an example of this alleged pattern of misrepresentations, Relator avers that in 2009, Defendant South University asserted on campus tours that its MSN Nurse Practitioner and Accelerated RN to MSN nursing programs were CCNE-accredited, as did the school's website and lead sources, but they were not. SAC (ECF No. 27), ¶ 43. "Students who relied on these false statements and attended Defendant's nursing programs often found themselves unable to practice in the nursing field after graduation or transfer their credits to a properly-accredited program, as CCNE-accreditation is required in several states." *Id.* Also, on January 26, 2010, a nursing student identified as Student 1 in the SAC, emailed South University, asserted that its website was misleading and confusing, demanded to know if the Nurse Practitioner program was accredited, and asked if she would be able to take her nursing board exams upon completion of the program. SAC (ECF No. 27), ¶45. Continuing at least until March, 2011, there were students complaining about "being pushed into enrolling into South University's nursing programs without being told the programs were not CCNE-accredited at the time of their enrollment." SAC (ECF No. 27), ¶46.

**Misrepresentations as to Job Placement - SAC (ECF No. 27), ¶¶ 48-54**

Relator avers that Defendants consistently and routinely made false, erroneous or misleading statements concerning, *inter alia*, "data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements," in violation of 34 C.F.R. § 668.14(b)(10) which operates where an educational institution advertises job placement rates as a means of attracting students to enroll in the institution. SAC (ECF No. 27), ¶48. The SAC alleges that Defendants' Recruiters "relied on internal documents for job placement statistics and, in 2009, told students that 87 percent of The

9

Art Institutes graduates and 92 percent of South University graduates were employed in a field related to their studies . . . [, and that] graduate statistics listed the average salary for South University graduates at $51,000, and the average salary for The Art Institutes graduates at $31,455," but that "Defendants' recruiters' sales pitches failed to inform students that Defendants kept two sets of job placement statistics: one set was kept for accrediting agencies, the other set was kept for prospective students, employers, and the 'investment community.' The differences between these two reports hinged on which graduates were counted in the statistics. Placement rates quoted to potential students eliminated graduates who were single, stay-at-home parents, as well as graduates with jobs outside their fields of study. These reductions artificially inflated the job placement rates." SAC (ECF No. 27), ¶¶ 49-50. The SAC identifies additional misrepresentations regarding job placement statistics. SAC (ECF No. 27), ¶¶ 51-53. For instance, Relator alleges that recruiters did not tell prospective students that graduates who only worked for one day, graduates whose jobs were only tangentially related to their program's core competencies, and graduates who were self-employed were included in the "for students" job placement statistics. SAC (ECF No. 27), ¶¶51-53.[3]

### Misrepresentations as to Cost - SAC (ECF No. 27), ¶¶ 55-60

Defendants' PPAs and 34 C.F.R. §§ 668.43 and 668.73 require that institutions "certify [that] their schools exhibited complete candor and honesty while informing students about the costs of attending their institutions, as well as the amounts borrowed on the students' behalves to finance their educations." SAC (ECF No. 27), ¶¶ 55, 60. Paragraphs 56-59 offer some examples of how this obligation was allegedly skirted and how recruiters mislead prospective students about the costs of their programs. For instance, Relator asserts that drop-out students frequently

---

[3] For example, Relator alleges a graduate with an accounting diploma was counted as "working in his field" for statistical purposes as a cashier at McDonalds. SAC (ECF No. 27), ¶ 52.

complained about misleading information about total costs, Defendants trained recruiters to avoid speaking about the costs of a degree unless a prospective student repeatedly asked, and if a student asked, to give cost per credit hour of the course, not the total price of a program; recruiters also were trained not to discuss the number of credits the student would need to take and to be evasive in responding to cost questions. SAC (ECF No. 27), ¶¶ 56-59.

**Inadequate Tracking of Student Progress - SAC (ECF No. 27), ¶¶ 61-72**

Relator further alleges that in "order for a school to participate in any federal grant or loan program," a student must maintain satisfactory progress in his or her course of study according to the educational institution's published standards of satisfactory progress," 34 C.F.R. § 668.32, and that the school "is required to establish, publish and apply reasonable standards for measuring whether an otherwise eligible student is maintaining satisfactory academic progress in his or her educational program. 34 C.F.R. § 668.16. Under 34 C.F.R. § 668.16(e)(3), an institution's policy is considered reasonable if it is applied consistently to all students, e.g., full-time, part-time, undergraduate and graduate." SAC (ECF No. 27), ¶61-62. "The Satisfactory Academic Progress ('SAP') rules are meant to keep students from staying in school forever, as well as to keep colleges that receive federal funding for their students from milking the proverbial 'cash cow' forever." SAC (ECF No. 27), ¶ 63.

Relator avers several ways and offers some examples in which Defendants' SAP rules were inconsistently applied, and the "satisfactory progress" requirements ignored or circumvented in order to maintain unqualified students on their rolls. SAC (ECF No. 27), ¶¶ 64-72. For example, South University Online routinely failed to have any plan in place to calculate SAP for several hundred of its students each year, and despite its published policy, students at South University were frequently granted repeated appeals even after academic termination, and

students were pressured to re-enroll by Defendants' admissions representatives. SAC (ECF No. 27), ¶¶ 65, 68. Moreover, EDMC did not have an attendance policy, and did not withdraw students who did not attend classes. SAC (ECF No. 27), ¶71. Rather, EDMC implemented a policy that gave students who did not attend classes a grade of "F", allowing the student to stay on the rolls and EDMC to continue to receive federal aid for the non-attending student. SAC (ECF No. 27), ¶71.

### Incentive Compensation for Recruiters - SAC (ECF No. 27), ¶¶ 73-93

The Higher Education Act prohibits colleges and universities from providing "any commission, bonus, or other incentive payment . . ." to recruiters based on recruiting activities. 20 U.S.C. § 1094(a)(2). DOE regulations and the PPAs also require educational institutions to abide by the incentive compensation ban. This is by far, the most detailed and substantial portion of the SAC, describing the mechanics and operation of Defendants' alleged incentive compensation program, which Relator claims, was in flagrant and knowing violation of the incentive compensation ban as set forth in statute, regulation and PPAs. This portion of the SAC also offers specifics about how Defendants allegedly accomplished circumvention of the incentive compensation ban. SAC (ECF No. 27), ¶¶ 75-93.

The Court will not get into those specifics, however, because any FCA claims regarding the incentive compensation ban are barred by the "first filed rule," as will be discussed *infra*.

For each of the above categories, Relator alleges that Defendants' PPAs required them to certify that they complied with all federal statutes and regulations governing Title IV, HEA programs, including the particular regulations identified for each category, and that every federal student aid application submitted from one of Defendants' schools that purposefully misled students or was made with knowledge that the school was not in compliance with the applicable

regulation, was a false claim for payment.

In summary, Relator alleges that by Defendants' numerous false certifications to the government, Defendants "intentionally misled the United States to believe they were eligible to participate in Title IV, HEA programs when, in fact, they were not," that Defendants receive federal funds from several different Title IV, HEA programs in the form of grants and loans," and that because of Defendants' "false certifications as to eligibility to participate in Title IV, HEA programs, Defendants were able to receive federal funds in the form of Pell grants and federally guaranteed student loans that the United States, in many instances, ultimately will be forced to repay because of student defaults. Each of Defendants' requests for federal grants or guaranteed student loan money to which they were not entitled constituted a false claim to the United States." SAC (ECF No. 27), ¶¶ 94-98.

### False Claims Act Claims and Counts

Based on the foregoing averments of fact, Relator's Second Amended Complaint states the following six Counts:

- **Count I** - Violations of the False Claims Act, 31 U.S.C. § 3729(a), prior to and after the amendments enacted on May 20, 2009. Misrepresentations As To Accreditation. "Through the knowing and intentional misrepresentations as to the accreditation of their MSN Nurse Practitioner and Accelerated RN to MSN nursing programs, Defendants and their agents and/or employees knowingly made false certifications and caused to be presented false and/or fraudulent claims, records and statements in order to obtain federal loans and grants for students enrolled at their campuses." SAC (ECF No. 27), ¶¶ 99-105.

- **Count II** - Violations of the False Claims Act, 31 U.S.C. § 3729(a), prior to and after the amendments enacted on May 20, 2009. Misrepresentations As To Job Placement.

"Through the knowing and intentional misrepresentations as to their job placement statistics, Defendants and their agents and/or employees knowingly made false certifications and caused to be presented false and/or fraudulent claims, records and statements in order to obtain federal loans and grants for students enrolled at their campuses." SAC (ECF No. 27), ¶¶ 106-112.

- **Count III** - Violations of the False Claims Act, 31 U.S.C. § 3729(a), prior to and after the amendments enacted on May 20, 2009. Misrepresentations As To Cost. "Through the intentional and systemic misrepresentations as to the costs of Defendants' educational programs, Defendants and their agents and/or employees knowingly made false certifications and caused to be presented false and/or fraudulent claims, records and statements in order to obtain federal loans and grants for students enrolled at their campuses." SAC (ECF No. 27), ¶¶ 113-119.

- **Count IV** - Violations of the False Claims Act, 31 U.S.C. § 3729(a), prior to and after the amendments enacted on May 20, 2009. Failure To Adequately Track Student Progress. "Through the knowing and intentional failure to adequately track student progress at their institutions as required by federal regulations, Defendants and their agents and/or employees knowingly made false certifications and caused to be presented false and/or fraudulent claims, records and statements in order to obtain federal loans and grants for students enrolled at their campuses." SAC (ECF No. 27), ¶¶ 120-126.

- **Count V** - Violations of the False Claims Act, 31 U.S.C. § 3729(a), prior to and after the amendments enacted on May 20, 2009. Violations Of The Incentive Compensation Ban. "Through the knowing and intentional violations of the Higher Education Act's Incentive Compensation Ban, Defendants and their agents and/or employees knowingly made false

certifications and caused to be presented false and/or fraudulent claims, records and statements in order to obtain federal loans and grants for students enrolled at their campuses." SAC (ECF No. 27), ¶¶ 127-133.

- **Count VI** - Violation of the Reverse False Claims Act, 31 U.S.C. § 3729(a), prior to and after the amendments enacted on May 20, 2009. "Through the acts described above, Defendants and their agents and employees intentionally and knowingly failed to report students who should have been dropped from Defendants' schools due to attendance violations and/or enrollment into programs falsely certified by Defendants in order to "conceal, avoid, or decrease" an obligation by Defendants to return federal funding in the form of Pell grants and federally guaranteed loans to the government." SAC (ECF No. 27), ¶¶ 134-139.

For each of Counts I through V, Relator asserts:

Under the False Claims Act, 31 U.S.C. § 3729(a), in effect prior to May 20, 2009, Defendants have violated:

(a) 31 U.S.C. § 3729(a)(1) by knowingly presenting, or causing to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; and/or

(b) 31 U.S.C. § 3729(a)(2) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendants have violated:

(a) 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and/or

(b) 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.

SAC (ECF No. 27), ¶¶ 102-103, 109-110, 116-117, 123-124, and 130-131.

As to Count VI, Reverse False Claims, Relator alleges that under the False Claims Act, 31 U.S.C. § 3729(a) in effect prior to May 20, 2009, "Defendants have violated 31 U.S.C. § 3729(a)(7) by knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government," and under the False Claims Act, 31 U.S.C. § 3729(a)(1) as amended on May 20, 2009, Defendants have violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government." SAC (ECF No. 27), ¶¶ 137-38.

Relator demands a jury trial, and seeks injunctive and monetary relief, including: that Defendants cease and desist; that Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, that Defendants pay maximum civil penalties allowed for each false or fraudulent claim presented to the United States, and that he be awarded the maximum amount allowable to a relator pursuant to the Federal False Claims Act; costs, attorneys' fees and other just relief.

### C. EDMC's Motion to Dismiss

EDMC filed a motion to dismiss and brief in support vigorously challenging jurisdiction to entertain most of Relator's claims, and the adequacy and sufficiency of Relator's FCA claims for a variety of reasons.

EDMC's motion to dismiss raises the following challenges to the SAC: (1) the compensation claim in Count V is jurisdictionally barred by the FCA's "first filed" provision, 31

U.S.C. §3730(b)(5); (2) the misrepresentation claims in Counts I, II, and III, and the SAP allegations in Count IV do not satisfy Fed. R. Civ. P. 8 and 9(b), because (a) Mr. Sobek cannot plausibly allege that any fraud occurred over an eight-year period or at Argosy University and the Art Institutes, when he only worked for EDMC for a "sliver" of time and had nothing to do with Argosy or the Art Institutes, (b) the complaint does not plead plausible or particularized factual allegations to support the misrepresentation claims, and (c) the SAP allegations in Count IV are insufficiently pled; (3) Relator fails to allege essential elements under the FCA, including scienter, failure to allege any regulatory violations with regard to Counts II – IV, and failure to allege violation of any condition of payment, as opposed to a condition of participation in the financial aid programs; (4) "other jurisdictional flaws" undermine the SAC, namely the job placement misrepresentation claim is precluded by the public disclosure bar of the FCA, 31 U.S.C. §3730(e)(4)(a), and the doctrine of primary jurisdiction demands judicial deference to DOE enforcement procedures with respect to Counts II – IV; and (5) that Count VI of the SAC fails to state a claim for reverse false certification. (In *Education Management Corp.,* EDMC raised a number of similar issues.[4])

---

[4] EDMC advances the following primary arguments: (1) the Compensation Plan, as written, complies with the Safe Harbor; (2) Plaintiffs failed to adequately plead the details of the alleged fraud to satisfy all the elements of a prima facie case under the False Claims Act in support of the "as implemented" theory; (3) the Incentive Compensation Ban was a condition of participation, rather than a condition of payment, the appropriate avenue for relief is regulatory enforcement and not the False Claims Act; (4) federal common-law claims are displaced by the complex regulatory regime created by Congress and the Department of Education to enforce the HEA; (5) the governments have received the benefit of their bargain, i.e., the education of students; (6) the state law pleadings fail for similar reasons; and (7) Mahoney's claims should be dismissed because he is a "second filed" relator.

*Education Management Corp.,* 2012 WL 1658482, at *7.

**D. Legal Analysis**

**1. Pleading Standards Under Federal Rules of Civil Procedure**

**a. Fed. R. Civ. P. 12(b)(6)**

In light of the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a complaint may be dismissed pursuant to Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Phillips v. Co. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). While *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) allowed dismissal of a claim only if "no set of facts" could support it, under *Twombly*, and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a claim for relief under Rule 12(b)(6) now "requires more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

In *Iqbal*, the Supreme Court held that a claim is facially plausible when its factual content "allows the court to draw a reasonable inference" that the defendants are liable for the misconduct alleged. *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). The plausibility standard in *Iqbal* "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 670. While well-pleaded factual content is accepted as true for purposes of whether the complaint states a plausible claim for relief, legal conclusions couched as factual allegations or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to an assumption of truth. *Id.* at 678. "Where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In order to satisfy the requirement of Fed. R. Civ. P. 8(a)(2) that a plaintiff include a "short and plain statement of the

claim showing that the pleader is entitled to relief," a plaintiff must aver sufficient factual allegations which "nudge" its claims "across the line from conceivable to plausible." *Id.*

As the Court of Appeals for the Third Circuit explained in *Fowler*, 578 F.3d at 210–11:

> The Supreme Court's opinion in *Iqbal* extends the reach of *Twombly*, instructing that all civil complaints must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S.Ct. at 1949.
>
> Therefore, after *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Id.* Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips*, 515 F.3d at 234–35. As the Supreme Court instructed in *Iqbal*, . . . [the] "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*See also Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). To determine the sufficiency of a complaint under *Twombly* and *Iqbal*, the court must take note of the "elements a plaintiff must plead to state a claim," identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth," and finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 130 (quoting *Iqbal*, 556 U.S. at 674, 679, internal quotation marks omitted).

In considering a Rule 12(b)(6) motion, a court accepts all of the plaintiff's allegations as true and construes all inferences in the light most favorable to the non-moving party. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008) (citing *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)). However, a court will not accept bald assertions, unwarranted

inferences, or sweeping legal conclusions cast in the form of factual allegations. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n. 8 (3d Cir. 1997). A court is not required to consider legal conclusions; rather, it should determine whether the plaintiff should be permitted to offer evidence in support of the allegations. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000).

Therefore, a plaintiff must put forth sufficient facts that, when taken as true, suggest the required elements of a particular legal theory. *See Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315 (3d Cir. 2008) (citing *Phillips*, 515 F.3d at 224). However, this standard does not impose a heightened burden on the claimant above that already required by Rule 8, but instead calls for fair notice of the factual basis of a claim while raising a "reasonable expectation that discovery will reveal evidence of the necessary element." *Weaver v. UPMC*, Civil Action No. 08-411, 2008 WL 2942139, *3 (W.D.Pa., July 30, 2008) (citing *Phillips*, 515 F.3d at 234; and *Twombly*, 550 U.S. at 555).

### b. Fed. R. Civ. P. 8

*Twombly* and *Iqbal* have not changed the other pleading standards for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and the requirements of Fed. R. Civ. P. 8 must still be met. *See Burtch*, 662 F.3d at 220. Rule 8 requires a showing, rather than a blanket assertion, of entitlement to relief, and "contemplates the statement of circumstances, occurrences, and events in support of the claim presented and does not authorize a pleader's bare averment that he wants relief and is entitled to it." *Twombly*, 550 U.S. at 555 n. 3 (internal alterations, citations, and quotations omitted). The Supreme Court has explained that a complaint need not be "a model of the careful drafter's art" or "pin plaintiffs' claim for relief to a precise legal theory" so long as it

states "a plausible 'short and plain' statement of the plaintiffs' claim." *Skinner v. Switzer*, ——
U.S., —— 131 S.Ct. 1289, 1296 (2011); *see also Matrixx Initiatives, Inc. v. Siracusano*, ——
U.S., —— 131 S.Ct. 1309, 1322 n. 12 (2011) (emphasizing that "to survive a motion to dismiss,
respondents need only allege 'enough facts to state a claim to relief that is plausible on its face'")
(quoting *Twombly*, 550 U.S. at 570)).

As United States District Judge Terrance McVerry further explained recently:

> [N]othing in *Twombly* or *Iqbal* has changed the other pleading standards for a
> motion to dismiss pursuant to Rule 12(b)(6). That is, the Supreme Court did not
> impose a new, heightened pleading requirement, but reaffirmed that Federal Rule
> of Civil Procedure 8 requires only a short, plain statement of the claim showing
> that the pleader is entitled to relief, not "detailed factual allegations." . . .
> Additionally, the Supreme Court did not abolish the Rule 12(b)(6) requirement
> that "the facts alleged must be taken as true and a complaint may not be dismissed
> merely because it appears unlikely that the plaintiff can prove those facts or will
> ultimately prevail on the merits."

*Education Management Corp.*, 2012 WL 1658482, at *6 (citations omitted).

### c. Fed. R. Civ. P. 9(b)

In *Education Management Corp.*, Judge McVerry thoroughly discussed the "more-
rigorous pleading standard in Fed. R. Civ. P. 9(b)," as follows:

> The imposition of a heightened pleading requirement in fraud actions serves
> important objectives: "Rule 9(b)'s heightened pleading standard gives defendants
> notice of the claims against them, provides an increased measure of protection for
> their reputations, and reduces the number of frivolous suits brought solely to
> extract settlements." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d
> 1410, 1418 (3d Cir. 1997). *See also Illinois Nat. Ins. Co. v. Wyndham Worldwide
> Operations, Inc.*, 653 F.3d 225, 232–33 (3d Cir. 2011) ("Rule 9(b) <u>exists to insure
> adequate notice</u> so that defendants can intelligently respond.").
>
> A plaintiff alleging fraud must state the circumstances of the alleged fraud with
> <u>sufficient particularity to place the defendant on notice of the "precise misconduct</u>
> with which [it is] charged." *Lum v. Bank of America*, 361 F.3d 217, 223–224 (3d
> Cir. 2004) (abrogated on other grounds by *Twombly*). To satisfy this standard, the

plaintiff must plead or allege the <u>date, time and place</u> of the alleged fraud <u>or otherwise inject precision or some measure of substantiation into a fraud allegation.</u> *See id.* at 224; *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (same); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir. 1999) (noting that plaintiffs averring securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story.").

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Supreme Court has explained that "generally" is a relative term: "In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid - though still operative - strictures of Rule 8." *Iqbal*, 129 S.Ct. at 1954; *But see Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,* 331 F.3d 406, 414 n. 2 (3d Cir. 2003) ("The purpose of Rule 9(b) is <u>to provide notice, not to test the factual allegations</u> of the claim.")

Moreover, in *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), the Court of Appeals explained that Rule 9 must be applied flexibly to alleged corporate fraud:

> <u>Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud."</u> Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, <u>courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control</u>. We agree that rigid enforcement in such circumstances could permit "sophisticated defrauders" to avoid liability. Nonetheless, even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based. *Id.* at 645 (citations omitted).

2012 WL 1658482 at *6-*7 (emphasis added).

The Court of Appeals for the Fifth Circuit has stated that the "time, place, contents, and identity" standard is not a straitjacket [but rather], . . . the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (relied upon and quoted in *United States v. Albinson*, Civil Action No. 09-1791, 2010 WL 3258266, *16 (D.N.J. August 16, 2010)).

Attempting to "effectuate[ ] Rule 9(b) without stymieing legitimate efforts to expose fraud," the *Kanneganti* Court held that "to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." 565 F.3d at 190-91. "Other courts have also recognized that Rule 9(b) in the context of the FCA does not provide courts with a mandatory checklist of what must be included in the complaint." *Albinson*, 2012 WL 3258266 at *16 (quoting *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)).

## 2. FCA Law

### a. Introduction

"The primary purpose of the FCA 'is to indemnify the government - through its restitutionary penalty provisions - against losses caused by a defendant's fraud.'" *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 305 (3d Cir. 2011) (quoting *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001)). Congress intended the FCA "to reach all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968).

The battleground of FCA litigation over alleged false claims, and in particular, over alleged false certifications of eligibility for Title IV, HEA financial aid programs by institutes of higher learning, has been charted many times and need not be meticulously re-charted in this case, although the broadside fired by EDMC at Relator's FCA claims can be previewed and understood by referencing a few of these cases, starting with *Education Management Corp.*, and several incentive compensation ban, circuit court of appeals decisions relied upon therein: *United*

*States ex rel. Lee v. Corinthian Coll.*, 655 F.3d 984 (9th Cir. 2011); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006); and *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005). *See also ex rel. Onnen v. Sioux Falls Ind. Sch.*, 688 F.3d 410 (8th Cir. 2012). Those cases render a comprehensive picture of the process of applying for eligibility and receiving financial aid, either directly or indirectly to students, pursuant to Title IV and the Higher Education Act, and the concerns perceived by many educators, legislators and courts since for-profit schools have gotten involved with Title IV, HEA funding streams in a big way.

Without delving into too much detail, the *Hendow* Court stated the following background:

> When an educational institution wishes to receive federal subsidies under Title IV and the Higher Education Act, <u>it must enter into a Program Participation Agreement with the Department of Education (DOE), in which it agrees to abide by a panoply of statutory, regulatory, and contractual requirements. One of these requirements is a ban on incentive compensation</u>: a ban on the institution's paying recruiters on a per-student basis. The ban prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). This requirement is meant to curb the risk that recruiters will "sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005), *cert. denied*, 547 U.S. 1071, 126 S.Ct. 1786, 164 L.Ed.2d 519 (2006). The ban was enacted based on evidence of serious program abuses. *See* S.Rep. No. 102-58, at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of student[s] for a given period"); H.R. Rep. No. 102-447, at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting that the "new provisions include prohibiting the use of commissioned sales persons and recruiters").

> This case involves allegations under the False Claims Act that the University of Phoenix (the University) knowingly made false promises to comply with the incentive compensation ban in order to become eligible to receive Title IV funds.

461 F.3d at 1168-1169 (emphasis added). *See also Education Management Corp.,* 2012 WL 1658482, *1-*2 (denying EDMC's motion to dismiss where Plaintiffs alleged EDMC paid incentive compensation to recruiters to attend their numerous affiliated schools, in violation of Title IV of HEA, 20 U.S.C. § 1070 *et seq.,* and EDMC's PPAs, and that, therefore, EDMC falsely represented its eligibility to receive federal student aid funds) (quoting *Assoc. of Accredited Cosmetology Sch. v. Alexander,* 979 F.2d 859, 860 (D.C.Cir. 1992) for succinct summary of how student financial aid programs are structured); *United States v. ITT Educ. Serv., Inc.,* Civil Action No. 07-0867, 2012 WL 266943 (S.D.Ind., January 30, 2012);*United States ex rel. Lopez v. Strayer Educ., Inc.,* 698 F.Supp.2d 633, 635 (E.D.Va. 2010); *United States ex rel. Torres v. Kaplan Higher Educ. Corp.,* Civil Action No. 09-21773, 2011 WL 3704707 (S.D.Fla., August 23, 2011).

### b. False Certification Theory

*Education Management Corp.,* provides the template for this Court's decision. *Education Management Corp.,* held, *inter alia,* that the Relators' and Intervenors' complaint adequately pled that the Defendants violated the incentive compensation ban set forth in statute, regulations and the PPAs, and so, stated a viable FCA claim under the "false certification theory" adopted by the Court of Appeals for the Third Circuit in *United States ex rel. Wilkins v. United Health Grp.,* 659 F.3d 295 (3d Cir. 2011). In *Wilkins,* the Court of Appeals considered and adopted the "false certification" theory in the health care arena, stating:

> A plaintiff, in order to establish a prima facie FCA violation under section 3729(a)(1), must prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *U.S. ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242 (3d Cir. 2004) (internal quotation marks omitted); *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir. 2001). . . .

There are two categories of false claims under the FCA: a factually false claim and a legally false claim. *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008). A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and <u>a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment.</u> *Id.* A legally false FCA claim is based on a "false certification" theory of liability. *See Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 303 (3d Cir.2008), *overruled in part on other grounds by U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009). On this appeal, we are concerned only with allegedly legally false claims related to appellees' eligibility to receive payment, as appellants do not contend that appellees did not deliver the services for which they sought payment.

There is a further division of categories of claims as the courts have recognized that there are two types of false certifications, express and implied. *See, e.g., Conner*, 543 F.3d at 1217.

*Wilkins*, 659 F.3d at 304-05 (emphasis added).

Judge McVerry in turn applied the false certification theory in *Education Management Corp.* in the Title IV, HEA incentive compensation ban context, to analyze whether Relators had stated a prima facie case under the FCA:

Count I of the Relator Complaint asserts a claim under the federal False Claims Act. Count I of the Intervenor Complaint is based on a violation of the False Claims Act, 31 U.S.C. § 3729(a) (1), which was in effect from July 1, 2003 to May 20, 2009. Counts II and III are based on the False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted at 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), respectively. The parties have not pointed to substantive differences between the versions of the statute. Under each version, the elements of a prima facie case under the federal False Claims Act are: (1) the defendant presented a false or fraudulent claim against the United States; (2) the claim was presented to an agency or contractor of the United States; and (3) the defendant knew the claim was false or fraudulent. *See Wilkins*, 659 F.3d at 305; *United States v. Thayer*, 201 F.3d 214, 222–23 (3d Cir. 1999).[5]

---

[5] It would appear that there is an additional element – materiality - with respect to the pre 2009 section 3729(a)(2) ("knowingly making, using, or causing to be made or used a false record or statement <u>to get</u> a false or fraudulent claim paid or approved by the Government"), and current version section 3729(a)(1)(B) ("knowingly makes, uses, or causes to be made or used, a false record or statement <u>material to</u> a false or fraudulent claim"). *See United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300 (1st Cir. 2010) ("We have long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material. . . . We reach the same conclusion regarding Congress's 2009 amendment to the former section 3729(a)(2), incorporating an explicit materiality requirement in place of the "to get" language that the Supreme Court relied upon in its decision limiting

\* \* \*

Plaintiffs contend that the falsity element of the prima facie case is established under several different theories. In *Wilkins*, the Court of Appeals for the Third Circuit held that a False Claims Act cause of action may be based on actions that are: (1) "factually false"; or (2) "legally false." 659 F.3d at 305. A claim is "factually false" when the claimant misrepresents the goods or services that it provided to the Government. *Id.* A claim is "legally false" when the claimant knowingly falsely certifies that it has complied with a statute or regulation, the compliance with which is a condition of Government payment. *Id.* There are two types of "legally false" claims. <u>Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds.</u> *Id.* Under the broader "implied false certification" theory adopted in *Wilkins*, liability attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it has violated regulations that affect its eligibility for payment. *Id.* As the *Wilkins* Court explained: "Thus, an implied false certification theory of liability is premised on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id.* (citation omitted). Several courts have also recognized False Claims Act liability for violations of the Incentive Compensation Ban under a fourth theory, namely fraudulent inducement. *See Hendow*, 461 F.3d at 1173–74.

2012 WL 1658482, \*8, \*13 (footnotes omitted; emphasis added).

While most if not all of these theories are arguably applicable to the allegations set forth herein, suffice it to treat Relator's FCA claims in Counts I through V as stating an "express false certification" theory, since these claims are predicated on Defendants' false certification of compliance with conditions of eligibility for payment under Title IV, HEA, DOE regulations,

---

liability in *Allison Engine[Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)]; *United States ex rel. Hill v. Univ. of Med. & Dent.*, 448 Fed.Appx. 314, n.4 (3d Cir. 2011) ("Although the parties and the District Court discuss the materiality of the data to the claim, we need not address the issue. At the time of this dispute, we had not recognized an implicit materiality element. . . . Congress has since amended the FCA in the Fraud Enforcement and Recovery Act of 2009, Public Law 111–21, and explicitly imposed a materiality element on claims. Because we find this claim fails for other reasons, we need not address whether the judicially-created materiality element is applicable . . . ."). *See also United States ex rel. Pilecki-Simko v. Chubb Inst.,* 443 Fed.Appx. 754 , 761 n. 18 (3d Cir. 2011) ("Ninth Circuit's decision in *Hendow*, . . . articulated the essential elements of a FCA claim under a false certification theory slightly differently than we have - (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due . . . .").

and the PPAs; without certifying their compliance, Defendants would not be eligible and could not participate in the Title IV financial aid funding streams.

The Court will review EDMC's challenges to the SAC within this framework, after setting forth the most pertinent provisions of the PPA attached as Exhibit 2 to EDMC's brief in support of its motion to dismiss.[6] (ECF No. 49-3)

### c. Program Participation Agreement

The exemplar PPA, entitled "Federal Student Aid School Eligibility Channel," states on its cover page: "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's <u>initial or continued participation</u> in any Title IV, HEA Program." (ECF No. 49-3 at 2) (emphasis added). The Preamble and Scope of Coverage sections provide that the Institution, here EDMC, and the Secretary of Education "agree that the Institution may participate in those student financial assistance programs authorized by Title IV of the [HEA] . . . and further <u>agrees that such participation is subject to the terms and conditions set forth in this Agreement</u>. . . . This Agreement covers the Institution's <u>eligibility to participate</u>" in the following enumerated Title IV, HEA programs: the Federal Pell Grant Program, Federal Family Education Loan Program, Federal Direct Student Loan Program, Federal Perkins Loan Program, Federal Supplemental Educational Opportunity Grant Program, and the Federal Work-Study Program. Exhibit 2, (ECF No. 49-3 at 3) (statutory and regulatory citations omitted; emphasis added).

In its General Terms and Conditions, the PPA states that the "Institution understands and agrees that it is <u>subject to and will comply with the program statutes and implementing</u>

---

[6] The Court agrees with Defendants that this representative PPA may be considered without converting the motion to dismiss to a motion for summary judgment pursuant to Fed.R.Civ.P. 12(d), because Relator references the PPAs extensively throughout the complaint. *See Stockport Mtn. Corp. LLC v. Norcross Wildlife Found., Inc.,* Civil Action No. 11-0514 , 2012 WL 719345 at *4-*5 (M.D.Pa. March 1, 2012); *Claret Capital Nominees v. Benett,* Civil Action No. 09-3532, 2009 WL 4362821 at *2-*3 (E.D.Pa. November 30, 2009).

regulations for institutional eligibility as set forth in 34 CFR Part 600 and for each Title IV, HEA

program in which it participates, as well as the general provisions set forth in Part F and Part G

of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34

CFR Part 668." Exhibit 2, (ECF No. 49-3 at 3-4) (emphasis added). The PPA then lists certain

selected provisions from General Provisions, 34 C.F.R. Part 668 with which EDMC has agreed

to comply as conditions of eligibility for the financial aid programs, including the following:

> (4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs, together with assurances that the institution will provide, upon request and in a timely manner, information relating to the administrative capability and financial responsibility of the institution . . . [to various state and federal and local entities];

> \*   \*   \*

> (6) It will comply with the provisions of §668.16 relating to standards of administrative capability;

> \*   \*   \*

> (9) It will comply with the requirements of Subpart D of 34 CFR part §§ 668 concerning institutional and financial assistance information for students and prospective students;

> (10) In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment - (i) The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and (ii) Relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students;

> \*   \*   \*

> (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any

persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance, except that this requirement shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal Student Assistance. . . .

Exhibit 2, (ECF No. 49-3 at 5-9) (emphasis added).

The PPA attached as Exhibit 2 was executed in December 2006 on EDMC's behalf by John R. McKernan, Jr., Chairman and CEO of EDMC, Exhibit 2, (ECF No. 49-3 at 20), who apparently signed and submitted the PPAs on behalf of all EDMC institutions from December 2006 through 2008. *See Education Management Corp.*, 2012 WL 1658482, *16.

Similarly, the HEA provides: "(a) Required for programs of assistance . . . In order to be an eligible institution . . . , an institution must be an institution of higher education . . . and shall . . . enter into a program participation agreement with the Secretary. The agreement shall condition the initial and continuing eligibility of an institution to participate in a program upon compliance with" a number of requirements reflected in DOE regulations and the PPAs. 20 U.S.C. § 1094(a) (emphasis added).

### 3. EDMC'S Motion to Dismiss

In light of the pleading and substantive standards set forth above, the Court will review Defendants' challenges to Relator's SAC, not necessarily in the order raised.

### a. The incentive compensation ban claim at Count V is precluded by the "first filed" rule.

Relator concedes that the false certification claims filed against EDMC in *United States ex rel. Washington v. Education Management Corporation* based on Defendants' violation of the incentive compensation ban and knowingly false certifications of compliance, which survived Defendants' motion to dismiss, preclude him from raising the same claims in this case. *See United States ex rel. LaCorte v. Smithkline Beecham Clinical Lab., Inc.*, 149 F.3d 227, 229 (3d

Cir. 1998) ("no *qui tam* plaintiff may recover for a false claim or share in a government settlement if his or her allegations repeat claims in a previously filed action"). Count V must, therefore, be dismissed with prejudice.

### b. The misrepresentation claims in Counts I, II, and III, and the SAP allegations in Count IV satisfy Fed. R. Civ. P. 8 and 9(b).

EDMC argues that Relator cannot plausibly allege that any fraud occurred over an eight-year period or at Argosy University and the Art Institutes, when he only worked for EDMC – South University Online, for a "sliver" of time and had nothing to do with Argosy or the Art Institutes. EDMC made similar arguments on the motion to dismiss in *Education Management Corp.*, without success.

As Judge McVerry stated in that related case:

> Plaintiffs allege that EDMC corporate headquarters signed and submitted the PPA's on behalf of all of its related educational institutions. . . . In addition, Plaintiffs aver that the compensation plan was developed by an EDMC-wide task force. . . . Because government funding represented such a significant source of EDMC's revenues, it is plausible that any conduct which would have imperiled those revenues, such as the alleged violations of the Incentive Compensation Ban, would have required approval from the highest levels of EDMC management. In sum, Plaintiffs have pled the involvement and knowledge of senior EDMC executives. <u>Because Plaintiffs' theory is that there was one, EDMC-wide scheme controlled by top-level executives, it is not necessary to allege separate conduct by each of the affiliated schools named as Defendants.</u>

*Education Management Corp.*, 2012 WL 1658482, at \*16 (emphasis added).

Relator Sobek was a Project Associate Director of Admissions ("ADA") for EDMC Online Higher Education's South University brand in Pittsburgh, Pennsylvania from June 2008 until November 2010; Relator Washington in the related *Education Management Corp.* was also an ADA for EDMC who did not work at each affiliate school nor did she work for the entire time period of the fraud claimed. As an ADA, it is plausible that Sobek acquired knowledge of

31

EDMC system-wide corporate policies designed and utilized in service of the overarching, system-wide false certification financial aid scheme alleged, and spanning a longer period of time than his actual employment period of almost two and one-half years. ("Relator's role allowed him wide access to enrollment data, reports, training materials, and memoranda detailing the policies related to EDMC . . . ." SAC (ECF No. 27), ¶ 9).

For the reasons set forth in *Education Management Corp.,* this Court finds that Relator Sobek's FCA claims survive despite his limited time (two and one-half years cannot reasonably be considered a "sliver" of time) and the fact he did not work directly at Argosy or the Art Institutes. 2012 WL 1658482, at *12-*18.

### c. The SAC adequately avers the elements of the FCA claims, and the facts in support of the misrepresentation claims in Counts I, II and SAP allegations in Count IV are sufficiently pled.

After careful consideration of the averments of fact supporting Counts I, II, IV and V, which are assumed to be true at this stage of proceedings, the Court finds that Relator has stated sufficient facts which plausibly state the elements of FCA claims under 31 U.S.C. § 3729(a), based upon misrepresentations as to accreditation (Count I), job placement (Count II), tracking student progress (Count IV), and the incentive compensation ban (Count V), although Count V should be dismissed pursuant to the first filed rule.

Relator has made plausible and particularized factual allegations in Counts I, II, IV and V of his SAC, read in its entirety and assuming the truth of the factual allegations. In fact, the SAC is quite detailed with regard to the nature of the alleged fraudulent scheme and those counts, SAC (ECF No. 27), ¶¶ 48-93, and provides adequate notice to Defendants of the conduct Relator asserts constitutes FCA fraud under 31 U.S.C. § 3729(a). Counts I through V identify five ways in which Defendants' certifications of compliance are allegedly false; <u>all of them arise from the</u>

32

same source of conditions for eligibility for the financial aid funding streams – the HEA, DOE regulations at 34 C.F.R. § 668, and the PPAs. Defendants' obligations to present honest, accurate information to prospective and enrolled students with regard to the cost of educational programs and degrees, job placement statistics and accreditation, are all prerequisites to eligibility to participate in the federal financial aid programs, just as much as the obligation to honor the incentive compensation ban.

Certifications of compliance made despite knowing violations of the incentive compensation ban expose educational institutions to liability under the FCA. Because the other prerequisites of eligibility arise from the same statutory, regulatory and contractual sources and serve the same purpose of protecting the federal fisc and prospective and enrolled students, knowingly false certifications of compliance with these other prerequisites similarly expose educational institutions to liability under the FCA. Count V is precluded by the first filed rule, but Counts I, II and IV should remain in the case.

As to Count III, however, the Court finds that Relator has failed to allege sufficient facts to sustain his claim that Defendants executed false certifications of compliance with regard to their obligation to give accurate information about the cost of the educational programs to students. The averments made regarding the alleged misrepresentations underlying Count III are non-specific and vague, (e.g., "students frequently [complained] that they were misled about costs," SAC (ECF No. 27), ¶56), and unlike recitations of the facts supporting the other Counts, include no examples of the complained of misrepresentations, and do not otherwise "inject precision or some measure of substantiation" into this fraud allegation. The Court recommends that Count III be dismissed with prejudice, because Relator has had two opportunities to flesh out this claim and apparently is unable to do so.

As to the scienter element, the FCA requires a defendant to have acted "knowing" or "knowingly," and defines these terms to mean: (A) that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1). As Judge McVerry held in *Education Management Corp.*, scienter can be pled generally under Rule 9(b), but the complaint still must state with some particularity the circumstances constituting fraud or mistake.

Reviewing the complaint in its entirety in *Education Management Corp.*, Judge McVerry had little difficulty finding that "the scienter allegations satisfy the applicable pleading standard. It will be incumbent upon Plaintiffs to prove that EDMC acted with the requisite scienter, but dismissal is not warranted at this stage of the case." 2012 WL 1658482, at *18. So too herein, averments supporting the requisite scienter are set forth throughout the SAC with more than adequate particularity. *See e.g.*, SAC (ECF No. 27), ¶¶ 2, 21-23, 25-26, 28, 94-98.

### d. Relator adequately alleges violation of prerequisite conditions of eligibility, and not mere regulatory infractions regarding "conditions of participation," and the doctrine of primary jurisdiction does not demand judicial deference to DOE regulatory enforcement procedures in lieu of FCA claims.

Defendants argue that if any instance of alleged regulatory noncompliance were enough to state an FCA claim, then "every entity that does business with the government and promises not to violate the law could face litigation seeking to compel the return . . . of all federal monies it received based on the slightest allegation of illegality. . . . [and the FCA] would become exactly the kind of 'blunt instrument to enforce compliance with all ... regulations' that the Third Circuit and other courts of appeals prohibit." Brief for Defendants at 26, (ECF No. 49 at 33). "Were he able to state an FCA claim," the argument continues, "Mr. Sobek would

34

effectively convert federal courts into super-agencies with first-line responsibility for interpreting, enforcing, and sometimes creating new administrative obligations." *Id.* at 29, (ECF No. 49 at 36). Relying largely on *Wilkins*, EDMC argues that in "other words, federal regulations that do not 'require perfect compliance as an absolute condition for receiving' payment, but rely on an 'administrative mechanism for managing and correcting [regulatory] violations which includes remedies for violations other than the withholding of payment otherwise due' cannot give rise to FCA claims." *Id.* at 26-27, (ECF No. 49 at 33-34).

In a related jurisdictional argument, EDMC contends that the "administrative discretion built into DOE's misrepresentation and SAP regulations prevent Mr. Sobek from pursuing Counts I, II, III, and IV for another reason besides the condition-of-payment requirement. Where 'enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body,' . . . deference to that agency under the doctrine of primary jurisdiction" is required. *Id.* at 32, (ECF No. 49 at 39).

These variations on a theme need not long detain us. In *Education Management Corp.,* the Court stated:

> EDMC argues that even assuming arguendo that it paid ADAs improperly, the False Claims Act claims must be dismissed because compliance with the Incentive Compensation Ban was a "condition of participation" rather than a "condition of payment." In other words, EDMC might face a loss of eligibility to participate in student aid, but payments EDMC has already received would not be implicated. In essence, EDMC contends that ADA compensation is not a core programmatic concern such that compliance with the Incentive Compensation Ban should be enforced administratively by the Department of Education rather than through the drastic penalties available under the False Claims Act.
>
>            \*   \*   \*
>
> [*Wilkins*] explained that the False Claims Act "was not designed for use as a blunt instrument to enforce compliance with all medical regulations - but rather only those regulations that are a precondition to payment." *Id.* (citation omitted). A violation concerns a "condition of payment" if such violation "might cause [the

government] to actually refuse payment." *Id.* (citing *United States ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008)). . . .

This case is distinguishable from *Wilkins* because the Incentive Compensation Ban is simply not analogous to Medicare marketing regulations. In *Hendow*, 461 F.3d at 1175, the Court distinguished the Medicare context and rejected the argument that "the Incentive Compensation Ban [was] nothing more than one of hundreds of boilerplate requirements." 461 F.3d at 1175. The Court further reasoned that in the absence of False Claims Act liability, "the University would be virtually unfettered in its ability to receive funds from the government while flouting the law." *Id.* at 1176. *Accord Main*, 426 F.3d at 914 ("if the University knew about the rule and told the Department that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act"). In *Conner*, 543 F.3d at 1222, the Court explicitly stated that the Incentive Compensation Ban at issue in *Hendow* provided a "telling contrast" to an alleged violation of Medicare regulations. *Wilkins* cited *Conner* with approval and did not disavow or disagree with *Hendow* or *Main*. In sum, *Wilkins* does not mandate dismissal as a matter of law.

In summary, the Court will deny the motion to dismiss the False Claims Act challenges to the Plan "as implemented." This theory is inherently difficult to resolve at the motion to dismiss stage. The Complaint provides adequate notice of Plaintiffs' theory, such that EDMC is able to prepare a responsive pleading. It will be incumbent upon Plaintiffs to develop admissible evidence to support the theory, but they have adequately pled a cognizable claim.

2012 WL 1658482, *19-*20. *See also Sioux Falls Ind. Sch.,* 688 F.3d at 414-415 ("The scope of regulatory requirements and sanctions may affect the fact-intensive issue of whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific government payment. The issue is often complex and may require inquiry into whether a regulatory requirement was a precondition to the government payment or merely a condition of continuing participation in a government program. . . . [Cases collected, none of which] has held that a complex regime of regulatory sanctions precludes the Attorney General from suing under the FCA when the government has been damaged by a materially false or fraudulent claim for payment or by use of a record or statement in a materially false claim. . . . Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative,

to combat fraud.") (numerous citations and internal quotation marks omitted); *Hendow*, 461 F.3d at 1176 ("promises to comply with the Program Participation Agreement, are conditions of payment. These conditions are also 'prerequisites,' and 'the sine qua non' of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid."); *Main*, 426 F.3d at 917 ("University protests that this approach would treat any violation of federal regulations in a funding program as actionable fraud, but that's wrong. A university that accepts federal funds that are contingent on following a regulation, which it then violates, has broken a contract. . . . But fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. Tripping up on a regulatory complexity does not entail a knowingly false representation.").

For the above reasons, Defendants' "conditions of participation" and "primary jurisdiction" arguments are not persuasive, although Relator eventually will have to demonstrate that the conditions of eligibility to which Defendants agreed to comply in their PPAs were in fact "prerequisites" for eligibility for payment and participation in the federal financial aid funding streams.[7]

### e. The public disclosure defense is premature.

31 U.S.C. § 3730(e)(4)(a) provides that an action based upon public disclosures from certain listed sources bar an FCA action based upon the subject of the public disclosures, unless the person bringing the action is an "original source" of the information. EDMC's public disclosure argument is rather vague as to the source of the alleged public disclosures, and conclusory in declaring that Relator is not the sort of original source contemplated in the exception. At best,

---

[7] Numerous courts have observed that certification analysis is essentially a way to determine whether compliance was material to the government's decision to pay. *See, e.g., Hendow*, 461 F.3d at 1173 (explaining false certification in terms of materiality); *United States ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F.Supp.2d 972, 979 (W.D.Tenn. 2007); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F.Supp.2d 258, 264 (D.D.C. 2002) ("implied certification theory essentially requires a materiality analysis.").

this defense is premature.

**f. Count VI of the SAC fails to state a claim for reverse false certification.**

The Court agrees with Defendants that Count VI fails to state a claim. Most FCA claims typically allege the use of false statements to obtain payment from the government, but "reverse" FCA claims under 31 U.S.C. § 3729(a)(7) are "centered around an alleged fraudulent effort to reduce a liability owed to the government." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 513 n.12 (3d Cir. 2007). Further, such claims may not be redundant of FCA claims asserted under other provisions of section 3729. *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514-15 (E.D. Pa. 2010).

Relator fails to identify the statute, regulation or provision of the PPAs that obligates Defendants to repay monies improperly obtained because of false certification, and Count VI appears to be simply a redundant "flip-side" of the claims made in the preceding counts.

**III. Conclusion**

For all of the foregoing reasons, the Court finds Relator has met his burden of pleading sufficient facts to plausibly support all of the elements of his FCA claims at Counts I, II and IV of the Second Amended Complaint, and the motion to dismiss should be DENIED as to those counts.

Although Relator has met his burden of pleading sufficient facts to plausibly support all of the elements of his FCA claim at Count V regarding the incentive compensation ban, he is precluded from pursuing that claim by the first filed rule, and the motion to dismiss should be GRANTED as to Count V and the claim dismissed with prejudice.

Relator has not met his burden of pleading sufficient facts to plausibly support all of the elements of his FCA claims at Counts III and VI, and the motion to dismiss should be

GRANTED as to Counts III and VI and the claims dismissed with prejudice.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(D)(2) of the Local Rules for Magistrates Judges, Plaintiff is allowed until November 9, 2012 to file objections to this report and recommendation. Failure to file objections will waive the right to appeal. *Brightwell v. Lehman,* 637 F.3d 187, 193 n.7 (3d Cir. 2011).[8]


CYNTHIA REED EDDY
UNITED STATES MAGISTRATE JUDGE

cc: all counsel registered on CM/ECF

---

[8] Defendants also argue, in a footnote, that "No EDMC-affiliated entity does business as 'The Art Institutes Online,' and 'The Art Institutes International LLC' is a parent company of various ground schools, none of which are named in the Complaint." Brief in Support of Motion to Dismiss, (ECF No. 49, at 1, n.1). Defendants assert that "[t]hese entities should be dismissed at the outset." *Id.* The Court declines to address this factual issue raised in the footnote. Defendants may file a separate motion to dismiss or, if Relator concedes the point, a stipulation, if they wish to pursue the matter.